IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| CARL DAVIS AND JANIE DAVIS, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) 7:17-cv-02076-LSC ) |
| ROBERT CLAYTON, | ) ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION**

Plaintiffs Carl and Janie Davis ("Plaintiffs") brought this action against Defendant Robert Clayton ("Defendant") under 42 U.S.C. § 1983 and Alabama state law in Defendant's individual capacity as a police officer employed by the City of Eutaw, Alabama. Before the Court is Defendant's Motion to Dismiss. (Doc. 3.) This Motion has been fully briefed and is ripe for decision. For the reasons explained more fully herein, the Motion is due to be GRANTED.

**I.    BACKGROUND**[1]

Plaintiffs are residents of Eutaw, Alabama, and owned two German Shepards, Lady Ace and Django. On March 30, 2017, Lady Ace and Django

---

[1] In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and construe[s] the facts in the light most favorable to the plaintiff." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012).

escaped from their enclosed living area at the Plaintiffs' residence. At some point following their escape, the dogs arrived at the Eutaw Recreation Center. Plaintiffs were not aware that the dogs had escaped as they were out of town at the time.

Defendant is a police officer employed by the City of Eutaw, Alabama. He was dispatched to the Eutaw Recreation Center in response to a report that a stray dog had been killed at that location. Upon arriving at the scene, Defendant observed Lady Ace and Django in a small, playground-type space that sits between two buildings of the recreation center. Defendant activated his bodycam which filmed his encounter.

Defendant saw Lady Ace and Django, who were located near the dead dog. Before Defendant had fully exited his car, Plaintiffs' dogs began approaching him. Several people at the scene, Defendant included, warned others that the dogs "got that blood taste in their mouth" and would "bite somebody else." (Doc. 7 Ex. 1 at 1:07.) Apparently, Defendant was of the belief that Lady Ace and Django had killed the stray dog. Defendant stood behind the opened door of his patrol car and observed the dogs, who remained in the playground area of the recreation center for some time.

At one point, an employee of the street department arrived to collect the dead dog. Defendant warned the employee that Plaintiffs' dogs could be dangerous.

The Defendant's bodycam recorded the employee, in his sanitation truck, driving behind the recreation center on a small road that was separated from the playground and dogs by a chain-link fence. Using a mechanical arm attached to the sanitation truck, the employee picked up the dead dog. Plaintiffs' dogs aggressively barked and jumped as the employee collected the dead dog, although after the sanitation employee left the scene, Plaintiffs' dogs stopped barking. (*Id.* at 9:50.)

Defendant reported over his radio that he was worried because employees would soon start arriving at the recreation center and did not want the dogs to bite anyone. He stated that he would "lay them down" if the Plaintiffs' dogs approached him or if the Plaintiffs' dogs started going toward someone else at the scene. (*Id.* at 3:35, 6:33.) Defendant, apparently speaking with other members of the police department, requested that they attempt to locate equipment used by the animal control department to capture the dogs.

Minutes after the dead dog was removed, Lady Ace and Django moved from the playground area to a field behind one of the recreation center buildings. The dogs' location prevented Defendant from observing them from his vehicle. Defendant eventually retrieved his taser. (*Id.* at 13:14.) Although the bodycam video does not show what happened after Defendant left his car since the device was turned off, Defendant shot Django with a taser; Django then ran away and

returned to Plaintiffs' home. Defendant shot and killed Plaintiffs' other dog, Lady Ace.[2]

Upon their return to their home, Plaintiffs found Django in his pen "in shock" and began searching for Lady Ace. They encountered a neighbor, who informed them that a dog had been killed that morning. Plaintiffs called the police department and found out that Defendant had shot and killed a dog they later identified as Lady Ace.

Plaintiffs filed this action on November 7, 2017, in the Circuit Court of Greene County, Alabama, asserting claims of unlawful seizure in derogation of the Fourth Amendment under 42 U.S.C. § 1983 and Alabama state-law conversion. Defendant was served on November 13, 2017. He removed the action to this Court on December 13, 2017, and filed the pending Motion to Dismiss.

## II. STANDARD OF REVIEW

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, in order to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must "plead enough facts to state a claim to relief that is plausible on its face." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting

---

[2] It is unclear from the Complaint whether Django was tazed before or after Lady Ace was shot.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. This Court then "assume[s] the[] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading

standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001)).

Generally speaking, evidence not included on the face of a complaint should not be considered in ruling on a Rule 12(b)(6) motion to dismiss. *See* Fed. R. Civ. Pro. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Nonetheless,

> where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). A court may use extrinsic evidence without converting the defendant's motion to dismiss into a motion for summary judgment when "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). Additionally, "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189,

1206 (11th Cir. 2007). In addition to the allegations made in Plaintiffs' Complaint, both parties base their arguments and rely on the bodycam footage taken by Defendant during his initial arrival at the recreation center and leading up to the tasing and shooting of the dogs. (*See* Doc. 1 ¶ 16 ("It is alleged that Defendant . . . videotaped the incident for several minutes before he turned off the video immediately before he went to a hidden area behind the Eutaw Recreation Center . . . ."); Doc. 7 at 7 ("The Court should view the facts in the light depic[t]ed by the videotape"); Doc. 8 at 2.)

Even though Eleventh Circuit precedent allows for the use of documents referred to by the Complaint, this does not necessarily mean that the Court may rely on the bodycam footage referred to by the parties. *See Document*, Black's Law Dictionary (8th ed. 2004) (A document is "[s]omething tangible on which words, symbols, or marks are recorded."). The Eleventh Circuit has not directly ruled on whether bodycam footage referred to in a complaint may be used in consideration of the merits of a Rule 12(b)(6) motion to dismiss. In *Bogie v. Rosenberg*, the Seventh Circuit held that a court can consider a video referenced in and attached to the complaint when the video shows the "content and context of the alleged wrong." 705 F.3d 603, 608-09 (7th Cir. 2013). Other district courts of this Circuit have likewise considered video recordings referred to in, or attached to a

complaint. *See Bey v. Abrams*, No. 7:14-CV-02205-RDP, 2015 WL 3839908, at *1 n.1 (N.D. Ala. June 22, 2015); *Steen v. City of Pensacola*, 809 F. Supp. 2d 1342, 1344 & n. 2 (N.D. Fla. 2011) (considering video from police officers dashboard-mounted camera on motion to dismiss involving section 1983 claims alleging excessive force).

Based upon the test as stated in *Financial Security Assurance, Inc.*, the Court finds that it is proper to consider Defendant's bodycam footage. 500 F.3d at 1284 (Court must find that (1) the plaintiff refers to a document in his complaint, (2) the document is central to his claim, (3) its contents are not in dispute, and (4) the defendant attaches the document to his motion to dismiss.) Plaintiffs reference the video throughout their Complaint. (Doc. 1-1 at ¶ 16 & 26.) The video is central to Plaintiffs' claims as their "allegations are firmly based upon what they have seen" in the video. (Doc. 7 at 7.) Both the § 1983 claim and the conversion claim arise from Defendant's actions and omissions directly recorded in the video. Also, neither party disputes the accuracy of the video. (Doc. 1-1 at ¶ 16 & 26; Doc. 8 at Page 3-4.) Finally, Defendant has attached a copy of the video to his Reply in Support of his Motion to Dismiss. (Doc. 8 at Page 2.) The Court thus considers the bodycam video along with the other factual allegations in Plaintiffs' Complaint.

III. DISCUSSION

## A. FOURTH AMENDMENT VIOLATIONS

Plaintiffs argue that Defendant violated the Fourth Amendment[3] by "seizing" Lady Ace and Django without a warrant. Defendant argues that as a police officer, he is protected by qualified immunity from Plaintiffs' Fourth Amendment claims. To be entitled to a defense of qualified immunity, an official must be engaged in a "discretionary function" when he performed the acts of which the plaintiff complained. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). "To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and

---

[3] In the caption of Count I of their Complaint, Plaintiffs appear to argue that Defendant violated both the Fourth and Fourteenth Amendments to the Constitution. (*See* Doc. 1-1 at 6.) However, Plaintiffs at no other point in their Complaint raise any arguments or point to any facts that would support a Fourteenth Amendment violation. Nor do Plaintiffs make any arguments concerning a Fourteenth Amendment violation in their Response to Defendant's Motion to Dismiss. (Doc. 7.) As Plaintiffs make no argument to reach their burden of showing a violation of the Fourteenth Amendment, any such claim is due to be dismissed due to Defendant's qualified immunity.

(2) this right was clearly established at the time of the alleged violation." *Holloman*, 370 F.3d at 1264 (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999)).

There is little question that Defendant was acting within his discretionary authority when he tased Django and shot Lady Ace. To determine whether Defendant acted in his discretionary authority, the Court must ask whether his actions "(1) were undertaken 'pursuant to the performance of his duties,' and (2) were 'within the scope of [their] authority.'" *Dang ex rel Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 (11th Cir. 2017) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). "In applying each prong of this test, [the court] look[s] to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266.

Defendant was dispatched to the recreation center when there were reports that a stray dog had been killed. (Doc. 1-1 ¶ 9.) He then stayed at the location while he attempted to determine how to best protect himself and others from Plaintiffs' dogs, whom he believed to be dangerous. Protecting the public from potentially dangerous wild or stray animals falls squarely within a police officer's duties, and

his scope of authority. The Court is thus satisfied that Defendant acted within his discretionary authority.

Because Defendant acted within his discretionary authority, Plaintiffs must show that Defendant committed a violation of a constitutional right that was clearly established at the time of the violation. The Fourth Amendment guarantees that the "right of the people to be secure in their . . . effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

Although the Eleventh Circuit has not addressed whether a dog is an "effect" protected by the Fourth Amendment, the circuits that have reached this question are unanimous in finding that a dog is an effect. *See Carroll v. Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) ("[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment."); *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210–11 (3d Cir.2001); *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir.1994), *overruled on other grounds by Robinson v. Solano Cty.*, 278 F.3d 1007, 1013 (9th

Cir.2002). In addition, at least two district courts in the Eleventh Circuit have come to the same conclusion. *See Waltz v. Johnson*, No. 8:18-cv-47-T-23AEP, 2018 WL 1000044, at *1 (M.D. Fla. Feb. 21, 2018); *Esterson v. Broward Cty. Sheriff's Dept.*, No. 09-60280-CIV, 2010 WL 4614725, at *3 (S.D. Fla. Nov. 4, 2010).

That a personal pet such as a dog is an "effect" under Alabama law is not a surprising proposition, and review of case law indicates that dogs have been considered personal property in Alabama for well over a century. *See Louisville & N.R. Co. v. Fitzpatrick*, 129 Ala. 322, 325 (1901) (Owner of dog killed by defendant's negligent operation of rail engine and cars could recover for destruction of his "property."). Because "the [Supreme] Court has treated the term 'effects' as being synonymous with personal property," *Altman v. City of High Point*, 330 F.3d 194, 202 (4th Cir. 2003), it is easy for this Court to conclude that personal property, such as a dog, would also constitute an effect. *See Jacobsen*, 466 U.S. at 113 (Letters and packages constitute "effects" for the purposes of the Fourth Amendment); *United States v. Place*, 462 U.S. 696, 706 (1983) (Luggage containing contraband constitutes an "effect" for the purposes of the Fourth Amendment.)

The Court's conclusion that Plaintiffs' dogs are effects protected by the Fourth Amendment thus compels the Court to determine whether Defendant's

seizure of the dogs was objectively reasonable. The objective reasonableness test requires "careful attention to the facts and circumstances of each particular case" and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Courts must keep in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The allegations in Plaintiffs' Complaint along with Defendant's bodycam video relied upon by both parties demonstrates that Defendant's actions—including the tasing and shooting of Lady Ace and Django—were objectively reasonable. Defendant was responding to a call about a dead dog. Upon arriving, Defendant saw two German shepherds that he believed had killed the dog. Plaintiffs argue that there is no indication that Lady Ace and Django killed the dog, but the actual cause of that dog's death is unimportant to the Court's task. It is reasonable to conclude that Plaintiffs' dogs killed the dog, because (1) as Plaintiffs' Complaint alleges "Defendant . . . was dispatched to the Eutaw Recreation Center where a stray dog had allegedly been killed," (doc. 1-1 ¶ 9), and (2) upon arriving Plaintiffs' dogs were located near the dog and would not leave its location. Also,

Defendant's bodycam footage shows that he and other people at the scene believed that the dogs were acting in a threatening manner; including aggressively barking, and at one point jumping at a city worker who was collecting the dead dog. Defendant did not immediately use force against Lady Ace and Django; instead, he reported that he would take action, including "putting the dogs down", if the Plaintiffs' dogs moved against him or another individual at the scene.

The bodycam footage also shows that Defendant radioed for another officer to bring a dog-catching device, although there is no indication that it was actually brought to the scene. Plaintiffs argue that Defendant's actions were not objectively reasonable because he "had plenty of opportunity to make a plan to deal with the dogs other than shooting them and in fact acts inconsistently and perhaps irrationally by shooting one dog and tasing another." (Doc. 7 at 5.) Plaintiffs likewise argue that Defendant should have captured the dogs "with a net." Such arguments second-guess in hindsight what Defendant should have done—contradicting the spirit and purpose of qualified immunity. A reasonable officer on the scene would primarily be concerned with preventing further damage by the dogs to other property or persons; Defendant's actions are in lockstep with this principle. Absent physically leaving the scene and getting the dog-catching device

himself, Defendant could do no more than request that another officer find and bring him such device.

On the other hand, the video does not show the events directly before and after the shooting and tasing of Plaintiffs' dogs. Nor do Plaintiffs make any specific allegations as to what occurred in that time. Instead, Plaintiffs' Complaint states that Defendant acted with "malice" when he tased and shot Plaintiffs' dogs. (*See* Doc. 1-1 at ¶ 15 ("Defendant . . . showed malice in killing Lady Ace who was no more of a threat than Django who was tased and survived. Defendant . . . showed malice and willful intent to injure Django as well."); *Id.* at ¶ 47 ("Defendant . . . acted with malice as his conduct was premeditated and despicable and done with a willful and knowing disregard of Plaintif[f]'s rights and safety.").) Plaintiffs likewise make the general statement that "[i]t is unreasonable for a police officer to believe that they can shoot and kill or injure dogs simply because they are loose and escaped from an enclosed area." (*Id.* at ¶ 14.) Allegations of "malice" and "unreasonableness" are not well-pled, as they are merely "[t]hreadbare recitals of the elements" needed for Plaintiffs to fulfill their burden. *See Iqbal*, 556 U.S. at 678-79 Such allegations are not entitled to an assumption of truth. *Id.* Upon removal of such legal conclusions, Plaintiffs' Complaint does not contain any allegations that

would show Defendant's tasing and shooting of the dogs was objectively unreasonable.

It is difficult for the Court to evaluate what exactly prompted the Defendant to affect the seizure; nonetheless, the Plaintiffs bear the burden of showing a constitutional violation, *Holloman*, 370 F.3d at 1264, and they have failed to explain how Defendant's actions were not objectively reasonable. The circumstances surrounding the tasing and shooting[4] indicate that the Defendant's actions were objectively reasonable. As stated in *Altman*,

> When a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal . . . waxes dramatically, while the private interest correspondingly wanes. Put simply, while we do not denigrate the possessory interest a dog owner has in his pet, we do conclude that dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance.

330 F.3d at 205-06. Plaintiffs' possessory interest in the dogs was dramatically reduced under the circumstances. They were running free, had apparently killed another dog, were exhibiting aggressive behavior to persons approaching them, and

---

[4] Plaintiffs also argue that it was unreasonable for Defendant to tase one dog and shoot the other. They do not elaborate how this is unreasonable. Defendant was ultimately concerned with subduing the dogs. That Django—the tased dog—apparently fled the recreation center after being tased would in some ways be undesirable as Defendant was unable to capture him. While the result of the greater use of force against Lady Ace is certainly regrettable, it was objectively reasonable given the Defendant's interest in subduing the dogs.

were remaining in an area that was shortly going to be populated by recreation-center employees. The reasonableness of Defendant's actions would be complicated if the dogs were in the physical possession of their owner, on leashes, or not exhibiting aggressive behavior. Although the injury to Django and the shooting of Lady Ace are unfortunate, Defendant had a duty to protect other members of the public from what appeared to be dangerous dogs. When the Plaintiffs' dogs escaped, Plaintiffs' possessory rights over the dogs greatly diminished, while the government's interest in protecting the public—and other private property, such as the dead dog—increased. Thus, under the circumstances of this case, Defendant's use of force was objectively reasonable.

Even if Plaintiffs showed a constitutional violation, which they have not, their Fourth Amendment claim would still be subject to dismissal because there is no clearly established case law showing that the Fourth Amendment prohibits a police officer from shooting a potentially threatening animal. *See Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1330 (11th Cir. 2006) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."); *Spivey v. Elliott*, 29 F.3d 1522, 1527 (11th Cir. 1994) ("The right must be particularized so that potential defendants are on notice that conduct in violation of that right is unlawful."). Plaintiffs admit that that "this issue has not

been clearly established" in this jurisdiction; they do not explain how the lack of clearly established law does not entitle Defendant to qualified immunity under Eleventh Circuit precedent. (Doc. 7 at Page 4.)

"[I]n the absence of fact-specific case law, the plaintiff may overcome the qualified immunity defense when [a] preexisting general constitutional rule applies 'with obvious clarity to the specific conduct in question,' and it must have been 'obvious' to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time." *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002). The general constitutional rule must be narrow enough "to give officers notice of unacceptable conduct." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). As mentioned above, there is relatively little case law, especially in the Eleventh Circuit, on what protections dogs have under the Fourth Amendment. Therefore, there was little opportunity for Defendant to have notice and "obvious clarity" that his actions would be illegal.

### B. ALABAMA STATE-LAW CONVERSION

Defendant argues that Plaintiffs' state-law conversion claim should be dismissed because, *inter alia*, he is protected by the peace-officer immunity afforded by Ala. Code § 6-5-338. Plaintiffs make no argument concerning Defendant's entitlement to immunity under this statute or why Defendant is liable

for conversion, in effect abandoning this claim. After examining the merits of Defendant's immunity argument, it is likewise clear that he is entitled to peace-officer immunity.

Alabama law also provides for qualified immunity to police officers from "tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338. This statute "shields every defendant who (1) is a 'peace officer,' (2) is performing 'law enforcement duties,' and (3) is exercising judgment or discretion." *Howard v. City of Atmore*, 887 So. 2d 201, 204 (Ala. 2003) (quoting Ala. Code § 6-5-338). If a defendant shows his entitlement peace-officer immunity by proving the above elements, the burden then shifts to the plaintiff to show that the defendant "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law" at the time of the challenged acts or omissions. *Ex parte Cranman*, 792 So. 2d 392, 402 n.13 (Ala. 2000). If the plaintiff makes such a showing, the defendant is not entitled to peace-officer immunity.

It is undisputed that Defendant was a police officer at the time of the acts alleged in the Complaint, fulfilling the first element. Defendant was likewise performing "law enforcement duties," as he was responding to a 911-call made by a

citizen concerned about a dead dog. Finally, Defendant was exercising judgment or discretion in that duty, as part of his duty involves protecting the people and property in the City of Eutaw. Defendant has thus shown his entitlement to peace officer immunity.

On the other hand, Plaintiffs have offered no argument against Defendant's entitlement to peace-officer immunity. As the Court stated above, Plaintiffs make many general allegations that Defendant acted with "malice," but such allegations cannot be afforded the assumption of truth as legal conclusions. In absence of these conclusions, there are no other facts that the Court gleans from Plaintiffs' Complaint and the bodycam video which would show Defendant acted with malice. Defendant is entitled to peace-officer immunity.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss is due to be GRANTED and this action dismissed. A separate Order consistent with this Opinion will be entered separately.

**DONE** AND **ORDERED** ON JULY 19, 2018.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

190485